Good morning. May it please the Court, Jonathan Lerner v. Pellin, Huntley USA. As the Court is aware, this case arises out of the nationalization by the United States government of the private baggage and passenger screening industry throughout the United States. As the Court of Federal Complaints noted, quote, Huntley performed passenger and baggage screening at airports across the country before those functions were federalized in 2002 pursuant to the Act. We understand the concern. We understand your concern as to what the trial court called the evolution of its thinking as it proceeded. Would you help us to understand the distinction between any claim for breach of contract that you are making and the basis of your claim? Is it expectations? Yes, Your Honor. As Your Honor notes implicitly, the lower court determined that we didn't have a protectable property interest because our contracts had termination clauses in them. But where is that law? What is the property interest? They are not going to terminate in accordance as they did with the contract? Yes, Your Honor. And we look to, we look, as I think the Supreme Court in Washington Legal Foundation and this Court in Meritrains says, the Constitution doesn't create those property rights. Those are created by state law. And as we've noted in our brief, when you're dealing with a contract right, a chosen action, the situs of the property reflects the law or influences the law that governs. Here, the situs of intangibles like contracts is the headquarters of the company that owns them, in this case Missouri. And as we, in our brief, Your Honor, cite, under Missouri law, there's no question, as the Clinch case versus the Heartland Health case says, under Missouri law, even a contract, even a contract that has a termination right in it, is a property right because, precisely because there's a subsisting relationship that's expected to continue. And that right has value unless and until terminated. So when the lower court said there's no interference here, precisely the opposite is true under Missouri law. You can certainly interfere with the contract, notwithstanding the fact that it has a termination right. The government's never argued and the lower court never addressed the underlying property rights here. It said there's no interference because of this, but it didn't engage in the analysis mandated by Maritrans and the U.S. Supreme Court, Your Honor. So we say the fact that the contracts were for a period of time subject to termination doesn't affect them. And indeed, the trial evidence was undisputed here that Huntley had performed those contracts for many, many years, had a stellar reputation, would not only have continued to perform those contracts, but would have burgeoned. It was increasing its market share under these contracts. That's inherent in the goodwill of the lawyer. As I understand it, you allege three things were taken. One, your security screening contracts. Yes, Your Honor. Okay. Two, what I think you referred to in the complaint and it turns up in some of the other papers, going concern value. Yes. And finally, your goodwill. Yes, Your Honor. How do you actually allege? Let me ask you this. What has to happen for a contract to be taken? I think you're correct that a contract is a cognizable property interest. It can be the subject of takings. But putting that aside, assuming that's the case, how does one take a contract? I would say, Your Honor, precisely how it was done here is one method. You make it illegal to perform that contract, insert yourself right in the place of the performance, and take the fees. And I think this was said in the lower court in NL Industries when it talked about the fact that, in that case, the transporter of the spent nuclear fuel and saying it wasn't a taking, said there was no attempt to take the transportation contract or get the fees of the transporter. Here the government made it illegal for Huntley to perform those contracts because the statute provides only government employees can do so. The government is given the right and exercised it to have the airlines, which used to pay Huntley, pay for those services. That's precisely how you could take a contract. What you had here, as I understand, you had this regulatory regime that existed, pursuant to which the airlines were required to provide screening services. And as a result of that, they entered into contracts with people like Huntley and others. The government then comes in and says, in the wake of 9-11, under the ATSA, the Congress passed and the President signed, now you airlines don't have to do this anymore. We're going to do it. That's what happened, right? Your Honor, not exactly. Because if they had said, Your Honor, there are no more, they declared the war the opposite. They declared the war on terror over and said there need not be any more screening. That would be a case where they relieved the airlines. The airlines are still paying. It's just paying the government. The airlines supplied the screening by paying Huntley. The TSA was given the authority and exercised it to require the airlines to pay Huntley. So Huntley's gone and they replaced Huntley. So I think, in response, Your Honor, to your other question about how to take a contract, I think Sienega 8 is very clear on that point. Nullifying contract rights does affect your way of taking. And here, by saying it's illegal for anyone other than a government employee to do screening, and the Congress knew that there were screening contracts here. Indeed, the statute itself focused on those screening contracts by providing under some circumstances that adequate compensation would be paid. The debate, including President Bush's letter where he opposed nationalization of this private industry, was precisely over whether the government would come in and nationalize the business that private screeners had performed under their private contracts. What does Huntley still do? Huntley's still, it's a going business, isn't it, still? I mean, it's not out of business. It's not nationalized like in the sense of seizing oil wells in Venezuela or something like that. It actually is barely in business because the other, the ancillary businesses were loss So it's barely in business, Your Honor. It's trying to do various ancillary things. But it's out of its main business is what I would say. One of the cases the government relies on is the Omnia case. And it's interesting, in that case, the court seemed to rely in part on an earlier case, Louisville National Railroad versus Motley. You're probably familiar with it. In that case, it was an interesting situation. Someone was injured in a collision between two trains involving the Louisville National Railroad, and the Motley's. And they entered into a settlement, a tort litigation. The way the settlement worked was the Motley's got free transportation on the railroad for the rest of their lives. But then Congress passed a statute which said, no, no, railroads can't do that. They can't give people free transportation. I guess it was combat rebates and that kind of stuff. And in the decision, which doesn't directly talk about a taking, but Justice Harlan suggests in the Louisville and Nashville case, that nothing was taken from the Motley's by reason of the fact that the government came in and said that that contract was illegal. I think the Monongahela case is more in point, which we cite, where the government came in and took the right to charge tolls on the navigable river. And the Supreme Court clearly said that that was a compensable taking. But wasn't the Monongahela case really a valuation? Yes, that was a valuation. I mean, clearly, there was a taking, and the government was saying, well, you know, we paid you for the lot. But the court promptly said, no, you have to also include the value of the toll revenue. Wasn't that it? I would say in Omnia and his progeny, Your Honor, that if this were a case, and that's a consequential issue case in my view. I think this court explained that. In our case it's consequential. Yes, in our Pegasus, for example, where you're talking about a derivative injury down the chain. And, for example, Your Honor, if Congress took all the airplanes because it needed them for military purposes, and Huntley lost revenue because it took the subject matter of the contract much the way in Omnia they took the steel, that's not something that we would recover for. Nor if Air Yugoslavia was decertified and we lost some screening revenue from that, that's not something we would complain about or could complain about. That's an Omnia case. Or if they closed the airspace and as a result no civilian aircraft could ever fly again, that would be down the line. But that's not what happened here. The government directed itself, just like in Siena Gardens, directed itself to those contracts and nullified them. And there's no question that the purpose of doing that was to eliminate this private screening industry. There's no secret about that. It was a raging debate. And in doing that, they took those contracts. They didn't take just a piece of it like a prepayment, right? They essentially replaced Huntley and made it impossible for Huntley to perform anywhere in the United States. That epitomizes the taking. We have a property interest in the contract, and the goodwill follows from that, which is a damage issue. So I think that when the judge below concluded that we don't have a property interest, he got it wrong and it should be reversed. And I also think the statute, the judge read out of the statute language that drives one to the conclusion that when the government assumed the responsibilities, as it admittedly did, and the judge said he was not going to get into the facts of what actually happened, because he concluded as a matter of law that the statute was clear. If it's clear, if there's anything clear about the statute, it's Congress knew that we were out, and that under circumstances where the government assumed the rights and responsibilities, not the contracts themselves, that we got compensation. And there's no reason, and the lower court gave one, why Congress would want to compensate the screeners if it took the rights and responsibilities, excuse me, if it took the entire contract, but not if it only took the rights and responsibilities, which is what the statute said. There's no reason to distinguish between the two. In fact, if the government didn't follow the precise letter of the statute, it shouldn't be a penalty to Huntley. Thank you, Your Honor. Mr. Chairman. Please, the court, come on. The government, as the court well knows, takes regulatory actions all the time that cause businesses to gain customers, lose customers, enable them to form new contracts, and cause them to have contracts canceled. That is not a taking of a contract, much less a goodwill or any derivative right of a contract. But the problem here is that the statute said that the subject depended on adequate compensation to the partners of the contract, so that it looks as if it was recognized, and this wasn't a routine regulatory action. This was an extreme action in a national emergency. So when they actually sit in the legislation, that they recognize that there's going to be a disruption of relationships, doesn't that seem to be a factor in the way it looks, that this is not a routine regulation in a regulated industry? No, not the first case. There are really two issues there, Your Honor, if I may. The focus of your question, I think, is the portion of the section 101G of ATSA that says, after Congress has instructed the TSA, it said the TSA shall assume these screening responsibilities, and the airlines have undertaken this since the early 70s. The next section, 101G2, says TSA may assume the rights and responsibilities of screening contracts. The structure of that statute, I think, follows in a way, it follows our analysis under the takings claim as well. What happened, what the Act said, and what happened is that, just as one of the questioners suggested, the airlines were, in fact, in this narrow instance, in effect, deregulated. They've been instructed since the 70s to provide this service. They had contracted it out largely to companies like Plano. Government, in this instance in the Act, said, you don't need to do that anymore. We will have federal employees doing it. So you can't do it? Well, they said to the airlines, in effect, you can, but they did not say what's important here for the contract, taking the contract analysis, is the way you take a contract, the way the government takes a contract, in response to just Shaw's question earlier, is either by expropriation or sort of annulment, eliminating or taking or removing a right under the contract, that's the important thing from one of the parties, not the ability to call it a right. But you have to consider, the whole principle of taking this law is, who bears the burden of federal action, which must be taken in the national interest. So here we have a federal action that's taken in the national interest, and we have Congress enacting a statute which essentially says, do the right thing with respect to contracts. Whether, in fact, I must say, the fact that these contracts are on termination clauses and the contracts were not breached, is an argument on the side of pure contract law. But don't you have to look at the context in which the entire situation arose, that's an extreme response to an extreme situation recognized by Congress. Do the right thing. Negative adequate compensation to the parties, to the contractor. They don't say, if you can get out of the contract in accordance with these terms, this doesn't count. Well, again, a couple parts to that, respectfully though, you don't reach the issue of what parties should bear harm. If there isn't a property interest in the case that has been taken, within the meaning of taking, then the precedents have come. Because if there's no property interest, it's not a taken case. The entire constitutional premise is that you do reach the issue of the public interest and the national interest and the allocation of burdens. So why, in this case, of extreme national interest, do we not reach it? If you look at Omnia and all of the progeny of Omnia, the property interest has to be identified specifically. Is this a taking case of a property interest? Because you don't have this overriding statutory thing. Well, in Omnia, Your Honor, there was a requisition of steel to prosecute a war, in effect, or prosecute a ban. And it was decided in order to permit steel to go forward. It's not directly in Congress. Respectfully, Your Honor, what was decided was that the action making the contract impossible to perform, in other words, by taking the subject matter, taking the steel, making one party unable to deliver under the contract, was not a taking of the contract because the rights under that sale contract still existed. Your Honor, you said that that was the only source of steel. Well, but the holding of the case was that that was not a taking of the contract. It may have been a taking of the steel from the seller. It was not a taking of the contract of the buyer because, and the reason of the case, the rationale of the case is that as a result of the government action, the performance of the contract was rendered impossible, but the contract was not appropriated. It was simply made impossible to perform. The government didn't insert itself or take a right. I didn't want to set you on that path. I agree it was not a taking of the contract. To me, it's more a matter of legitimate expectations rather than investment-backed expectations. Well, again, let me start from the beginning. Huntley's screening contracts, no doubt, were property. They were property in the same sense that the steel sale contract was property. In the Carney and Trecker case, for instance, it was also a sale contract. In Colvin Cattle, no doubt the ranch owner owned his ranch. That's property. In NL Industries, there was a contract that issued to transport nuclear waste. The contract's no doubt a property. The question is whether the government action has taken the contract or if, as the Court suggests, it simply frustrated the expectations under the contract, frustration of expectations under contracts. It's not a taking. It's not a taking. It's not a taking. The Court has held that again and again. It said it, for instance, in the Florida Rock case quite explicitly, and it follows from Montague, that frustrating the expectations of a business of how it would perform contracts is not a taking. And Huntley's contract- But that's a fact-dependent determination. I'm sorry? But that's a fact-dependent conclusion. It really depends on whether you can agree or frustration. Would it not? No, Your Honor, because- Is it by elimination of opportunity? No, it does not. It does not because the threshold is a legal issue. The threshold is has the government eliminated or expropriated a right, a right, contract right, that existed? Does the government say either that right no longer exists, as in Sienna-Gagarin's, or the government say that right is now ours, we have it now and you don't have it? Nothing like that happened. If that doesn't happen, it's not a taking of the contract. Mr. Chairman, let me ask you. The Huntley had contracts with various airlines for screening services, right? Yes. Let's take just one example. I think they had a contract with American Airlines. Sure. And you're saying there was no taking in this case. To contrast your position, give me- walk me through what would be an example of Huntley taking- what would the government have to have done in a very specific- if you could be as specific as possible, what would the government- give me conduct on the part of the government that you would acknowledge would have been a taking of the Huntley-American Airlines contract. Right. I can do that in a direct way because if it were true that what Huntley's counsel has suggested, the statute said were true, that would be a taking. If the government had said, not only are we going to perform this service, but those contracts no longer exist. Neither party can sue the other. There are no rights no more existing under those contracts. That's the elimination. Then the contracts would be gone. The government said nothing like that. The fact that these contracts had termination clauses in them means, first of all, most importantly, unlike the contract, for instance, in Amman, these contracts were performed according to their terms. They were not breached. That's a finding and that's a testimony of Huntley's CBO. They were not breached. So Huntley got not what it expected or hoped from these contracts, certainly, but it got what it borrowed. Mr. Lerner says that what's happened now, he says, well, no, the government did in effect take the contract because now the government has stepped into the shoes of Huntley vis-à-vis American Airlines or Delta or whoever and is now being paid by the airlines. Is that the fact that the airlines paid the government? Not in any correct way. No, it's not the fact, and there's no evidence. There's no real trial evidence about that. But let me say, the key break in the logical chain there is when you say in effect. Okay? If the government in effect begins to compete and sell a service that someone else was selling and even says we are the only ones who can sell this service, it's not a taking of a contract if the prior seller's contracts still exist or were performed. You would say it was a taking, Mr. Chapman, if the government had said the Huntley American Airlines contract is null and void. Yes. You would say it's a contract also, I'm sorry, a taking also, if the government had said we are going to step full bore into the shoes of Huntley in this contract and we are going to assume all of the rights and obligations of Huntley vis-à-vis American Airlines or Delta. Right? That you would say is a taking. Yes, I would, and I would also point out that that is what the option that was given to TSA, the authority to do such a thing under 101G2 of ASSA, you said you may assume subject to compensation if any. In other words, if the assumption wasn't to be a taking or the equivalent and there was compensation due, there would have been compensation due. That was an option and an authority that TSA had, but a step it didn't take. It never took. And a specific fact finding by the court here, the trial court, that it never took that action, but it's even been alleged that it never took that action. The Court of Federal Claims had a lot of language in its opinions. In fact, there was, and Mr. Lerner knows that both in his brief and oral argument, that there was no cognizable property interest. It seems to me that probably you're stepping back from that, that you're acknowledging that there was a cognizable property interest here, but government action did not take it. Am I clear? Yes. I think that's better phraseology. It's not as if Huffington was operating a business that had no property at all. I mean, clearly it had not only physical assets, but it had others. The items that he built are property interest items. Sure, and the contract is property. The contract is taken. That's property that is taken. But the finding here, the judgment is correct, and I also think the trial court's reasoning really is correct. I think if you read it, what the trial court is saying is that the action of the government didn't reach and impinge upon the compensable, the potentially compensable property. You're saying that the Court of Federal Claims should just have said it a little differently. I think arguably. I mean, you have in the case of Texas State Bank, for example. That's a case of no compensable property interest, flat out, because the plaintiff was seeking interest on its deposits at Federal Reserve Banks. This court said that's not even yours, so it's not even an issue. So clearly there was property here. There was a business, just as in, as I said, just as in Omni itself, just as in Karnian, Trecker, Colvin, NL Industries, any number of cases. There was property. The question is always did, under the Omni standard, did the government action come to that line and actually take the contract, the property? Right. I know Omni is cited in some of our cases, but how viable is it in terms of, has the Supreme Court recently relied on Omni? I'm not, that's not a trick question. I don't know the answer. I mean, I know we've cited it in some of our cases. For example, Eric Pegasus. Yes. Maybe others, but has it been recently noted in the Supreme Court? I do know, as you say, that this court has repeatedly cited it. This court also noted in a case that I wish I could find right here, but in a case, one of the cases in the early 90s that we cited, said the Supreme Court recently cited Omni in, I think it was a pension guarantee case, a takings case. So as recently as, you know, within the last decade and a half or so, certainly there's, I would presume, and certainly this court took pains in the immediately prior standard guards, the one prior to this year, I think it was in 05, took pains to distinguish what Omni is. Just one final thing, I don't want to take all your time. Would you say it would have been a taking here if the government had followed an approach different from the one that followed up the statute? As you point out, the statute did give the government the right to step into the shoes of Omni in a contract, say, with American Airlines. And in response to your earlier question, am I wrong in concluding that if the government, that you would agree that if the government had done that, it would have been a taking? Had it done it without negotiation, yes. I mean, the other option is that it certainly could have been, if it were admissible. No, but if the government had just exercised an apparent right under the statute and had come in and said, we're now in the shoes of Omni, then the government, you would say that would have been a taking. I think so. I think that's the hypothetical that cases like Omni are distinguishing, the case in which the government actually comes in and says, those contract rights that you have, those are our rights now. That is taking a contract. Nothing like that happens. I do want to follow up a little bit and make sure I understand your exchange with Jay Shaw. From his position, we're not relying on whether or not the contracts between the government and the airlines by their terms expired or were terminated. Is that right? In saying that there was no longer a property interest after those contracts expired. And we're not leaving. I hesitate to say we're not relying because we have in effect a list of problems with the claim. One of the threshold problems with the claim, we would say, first of all, is that these contracts were not even breached. The contracts, Huntley received what it had bargained for. Yes, exactly. That's what I was asking. Yes. Well, that's the threshold. If you were to set that aside and say, well, it was a potential frustration, if you still see something left that Huntley lost that it had actually had a property right to, a potential property right to, you look at Omnia. And Omnia says, no, even if we cause a breach, we the government cause a breach, we make it impossible to perform. As long as we don't take the right to sue, the right under the contract, the right of recourse under the contract we've not taken the contract. So there are at least two. We are, in a sense, relying on it, but we'd also say it's not necessary. If you want to go to this other, you don't even get to Omnia, pardon me, unless the plaintiff has lost a property right in the Department of Foreign Affairs. Thank you. I did hear Mr. Chadwick in response to Judge Schell's question say that it would be a taking if the contracts were nullified. But making it illegal for Huntley to perform those contracts, he would say making it illegal for the government to continue to employ Huntley is nullification of those contracts. It couldn't do it any better than to say it's illegal. And that is what the statute says. There's no question about it. It says only a government employee can perform screening henceforth. So let me ask you, I think you correctly recited what Mr. Chadwick acknowledged. Also, he does step back, I think, properly from the proposition that you seem to see in the court-filed claims decision that there's no cognizable property interest here. But what I'll do, just very briefly, is what you said in your main argument that the government was paying – I'm sorry, that the airlines were paying the government. Yes. And Mr. Chadwick, in his turn to the podium, said no, that's not really the case. What is going on here? I don't know if there's anything in the record. There doesn't seem to be anything in the record that we have from trial proceedings. There is, Your Honor. Exhibit 317, with depositions, and there's a trial record on this. Okay. It's not in the appendix, Your Honor, but at the trial, Exhibit 317 and I think 318. 316. 316, Your Honor. Trial Exhibit 316 talks about the airlines continuing to pay the government, and the government got authority right in the statute. It's in – it says that right in Section 118 of the statute, it gives the authority under 4-4940 called security service fee. It gives authority under 2, in addition to – What provision of the statute? This is Section 118 of ANSA entitled security service fee, and it gives the TSA authority to impose fees both on passengers and to impose fees on the airlines. So I guess Mr. Chadwick, though, would come back and he would say – I'm just – I can't speak for him. He'd say, well, that's true. They are being paid, but they're not being paid under the original contracts. They're being paid – they're not being paid – they haven't stepped into the Huntley American Airlines contract. They are now – they've now changed the regulatory environment or regime, and they are now – Correct. They made it illegal for Huntley to perform. So the airlines couldn't use Huntley after the act. Huntley's gone. It instructed the TSA to undertake the screening of all passenger and baggage screening throughout the United States,  So when you say, Your Honor, that it didn't step into the shoes of the contract, I don't think that the regulation here, which – and he said when I used the term in effect, that's where he draws the line, but I don't think that the fact that the government used the methodology that it employed to take the contracts makes it less of a taking. And I thought I also heard initially stepping back from whether we had property, and I did want to address Judge Newman's comment because the – and I just – because of this issue of the termination fees. The judge below in his final judgment made it very clear that the only reason that these contracts were terminated was because of the passage of acts, and he found that as a fact. And when one looks at the case law, the Missouri law, which does govern whether there is a property right regardless of this determination clause, there's no question that there's a continuing right in those contracts regardless of whether the airlines elected to terminate it. And it wasn't voluntary because it wasn't as if the airlines decided, Oh, we don't need Huntley. Once the act was passed, only government employees could perform that contract. It was impossible to perform that contract by virtue of the law that they passed with a specific purpose, and I can't conceive of a different purpose other than to remove Huntley from this business. This is a unique event. This is not your everyday. I can't find another circumstance where the government has nationalized a business. I did find one more review, University of Pennsylvania Journal of Labor Employment Law, which said the following. The federalization of airport screening workers is a unique event. It is not often that the United States, safe haven of capitalism in the free market economy, commandeers a private industry. What's his son's name? That, Your Honor, is 5 University of Pennsylvania Journal of Labor and Employment Law, page 360 to 2003 article. That is 360 or 260? 363. That is exactly what happened here. You can look at the details, and I fundamentally disagree with Mr. Javits' interpretation of what happened here. If you look at section 2 of 101G, there are two ways the government can take over the screening business, Your Honor. It could step into the Huntley side, and that would be assuming the rights and responsibilities. He says that would be a taking. And he says that would be a taking. And, of course, it's admitted that that's what they did. If it wasn't negotiated or looked at. Well, there are two aspects to this, because I think the negotiation was actually accomplished, and it's unclear what section the government was operating under. But what is clear is the Congress said you have to assume the contracts as quickly as possible. They said their mission, and this is in the record also, was to assume the rights and responsibilities. Mr. Washington, their witness, said that's what they did. But there's a timing provision. If you look in 3, which gives the government the right to step in on the airline side, in other words, get the contract transferred from the airline, there's no compensation in there, because then they would be paying Huntley under the contract. But that's limited in time. That's only for a year at most. They say 180 days, and you can get another, I think, 30 days, but it comes out to a year. There's no time limitation on number 2, which is take Huntley's place and take their rights and responsibilities. And they elected initially to do sort of a hybrid, but it was essentially we'll pay Huntley for services until we can get our force fired and on the ground. It's at that point when they stepped into the shoes of Huntley. They sent their people to every location. It's right in the record. One by one by one, they nationalized each location, stepped into Huntley's shoes, charged the airlines, Huntley's out. And that's what requires compensation. And that is where the taking is. Those property rights never would have been eliminated, regardless of the termination clause. And none of the airlines even bothered to terminate those contracts other than the one American Airlines letter that's in the record, precisely because there was no reason to terminate what could no longer be performed. And that's the reality here. It was a nationalization of the industry. They eliminated Huntley. They did take its contracts. Omnia has no application because the issue in Omnia, as Pegasus says and all the other cases subsequently say, whose property was taken? That's the issue. In NL Industries, it was not the transportation system. It was the failure to permit the fuel plant. In Omnia itself, it was the producer's steal, not the buyer's steal. In Pegasus, they only had a right to lease the premises. They had no right in the navigable airspace. It was somebody else's property, and they conceded as much, and you want to rely on that. Here, it was the contracts were the target here. That was exactly what the government was attempting to accomplish. And that is what the government did. And it's unfair for Huntley to bear the responsibility for the public, and that's what Armstrong and all the cases say. Thank you. Thank you. All rise. The Honorable Court is adjourned until tomorrow morning at 10 a.m.